## WM. K. REED AND THE DIME SAVINGS BANK
### v.
## LYDIA A. CRAMB AND MYRA A. PRICE.

*Collateral Security—Stock of Third Party as Surety—Release by Renewals of Secured Notes—Contract of Surety Strictly Construed.*

1. The contract of a surety is strictly construed in his favor, his liability never being extended beyond the terms of his agreement or at least its manifest import.

2. Where collaterals of a third party are pledged to secure a note, the payee having notice of the ownership thereof, such pledge only secures the fulfilment of the contract as it then stands.

3. In the case presented, it is *held:* That the owner of the collaterals in question can not be regarded as a principal; that the payee of the notes secured had no reason to suppose said collaterals had been exchanged by way of sale for a note for which they were substituted as security for said notes; and that said collaterals occupied the position of a surety and were released by the renewals of the notes secured.

### [Opinion filed December 11, 1886.]

APPEAL from the Circuit Court of Bureau County; the Hon. GEORGE W. STIPP, Judge, presiding.

Statement by LACEY, J. This was a bill in equity by appellees against appellants and Henry C. Reed, seeking to foreclose a lien against fifty shares of the capital stock of the Dime Savings Bank, of $100 each, which lien was created by way of pledge by William K. Reed, appellant, to secure the notes of H. C. Reed to the amount of some $3,300, and was substituted in the hands of Levi Kelsey, the father of appellees, who bequeathed the notes to them. The stock in question was placed in Levi Kelsey's hands in lieu of a $1,000 note and mortgage on one Buehler previously held as collateral security by said Levi Kelsey to secure the note of Henry C. Reed for the said $3,300. The original note on Buehler was placed in Levi Kelsey's hands by H. C. Reed, without knowledge on the part of the former that the latter was not the true owner of it. This

Reed v. Cramb.

Buehler note was exchanged between Kelsey with William K. Reed in place of the stock mentioned at H. C. Reed's request, and the stock was sent by William K. Reed to Kelsey by mail. The answer of the appellees separately filed sets up as defense and objects to the foreclosure on the ground that the stock mentioned was never the property of H. C. Reed, but was the property of William K. Reed, which was secured by Kelsey at the request of said H. C. Reed October 16, 1874, and was to be held as collateral security in lieu of the said Buehler note and mortgage; that the Buehler note and mortgage was the property of the appellant, William K. Reed, and that it and also the substituted stock was placed in Kelsey's hands to secure the original principal $16,000 note, of H. C. Reed to said Kelsey, upon the agreement that said H. C. would pay it up and return the said collaterals; that said Levi Kelsey had at the time due notice of the fact; that about the first of November, 1879, by agreement between the said Kelsey and said H. C. Reed, and without the knowledge and consent of William K. Reed, the original note of $16,000 was delivered up by Kelsey to H. C. Reed, and H. C. Reed gave to said Kelsey his notes in the sum of $3,300, the sum claimed to remain due in renewal, due one year after date, with interest at 8 per cent. per annum, and further, after the death of the said Levi Kelsey and the appointment of George M. Price as his executor, the said renewal notes of $3,300 being on the 13th May, 1881, the said executor with the consent of appellees, one of whom, Mary A. Price, was his wife, then gave further time of payment to said H. C. Reed without the knowledge and consent of the said William K. Reed and for a valuable consideration, and gave up the said $3,300 to H. C. Reed and secured from him one $1,600, payable to Lydia A. Cramb, due in one year from said date with 8 per cent. interest, and one for like amount with like interest, due in like time to appellee, Mary A. Price, and one to the said executor for $174.66, due six months after date, and that the last named note was duly indorsed to appellees.

The Dime Savings Bank filed similar answer. The answers claim that by said renewals under the circumstances the lien

Reed v. Cramb.

on the said stock was released. The court below upon issue being joined and upon hearing, decreed the relief prayed for in the bill. It appears from the evidence that Levi Kelsey renewed the original H. C. Reed note to the amount of $4,600, December 1, 1876, and again the one alleged in the answer, October 21, 1879, and again May 13, 1881, as alleged in the answer to the executor and the appellees; and that the appellants neither consented to nor knew of such extensions. Levi Kelsey died in December, 1879, and H. C. Reed became insane in 1882, and in 1884 Eugene C. Bates was appointed conservator. It appears by certain letters that passed between Levi Kelsey and Henry C. Reed, October 17, 1874, and from Kelsey to William K. Reed, October 23, 1884, and from William K. Reed to Levi Kelsey, October 16, 1884, that Levi Kelsey knew at the time of the writing of the letter above of October 16, 1884, when the stock in question was placed in Levi Kelsey's hands, that 1st, the stock belonged to William K. Reed; 2d, that the Buehler note and mortgage likewise belonged to him because it was sent to him by Kelsey, and the stock received inclosed in a letter which expressly stated that it belonged to said William K. Reed. From that time he perfectly understood the relationship that William bore to the stock and the debt of H. C. Reed.

Messrs. KENDALL & LOVEJOY, for Wm. K. Reed, appellant.

If a debtor pledges collateral security of his own for the payment of a note, and afterward makes payment upon the notes, and gives a renewal note for the balance due upon the original note, the lien upon the collateral security is not extinguished. Dayton Nat. Bank v. Merchants' Nat. Bank, 37 Ohio St. 208; Jones v. Pledges, Sec. 541; Pinney v. Kimpton, 46 Vt. 80; Moses v. Trice, 21 Gratt. 556.

This rule also applies where the debtor pledges securities not his own, and the creditor has no notice of the rights of a third person as security. Pinney v. Kimpton, 46 Vt. 80.

Where a person pledges his property as collateral security for the performance of a contract of a third person, such property stands in the position of a surety, and any changes

in the contract of suretyship which would discharge a surety, discharges the property held as collateral security. Burnap v. Nat. Bank, 96 N. Y. 125; Rowan v. Sharp Rifle Mfg. Co., 33 Conn. 18; White v. Ault, 19 Ga. 551; Barnes v. Mott, 64 N. Y. 397; Christner v. Brown, 16 Iowa, 130; Ryan v. Shawnee-town, 14 Ill. 20; Crawford v. Richeson, 101 Ill. 351; Denison v. Gibson, 24 Mich. 187; Smith v. Townsend, 25 N. Y. 479; Gahn v. Niemcewicz, 11 Wend. 312.

Mr. ALLAN C. STORY, for The Dime Savings Bank, appellant.

Messrs. F. P. SNYDER and MAYO & WIDMER, for appellees.

We insist that the *legal status of the substituted collaterals is the same as that for which it was exchanged;* that the rights of the parties became fixed at the time of the transaction, and that W. K. Reed should not now be heard to say this stock was in the position of a mere surety for Henry C. Reed's notes. Levi Kelsey, at the request of W. K. Reed, delivered to the latter a valuable note and mortgage, a consideration ample to support the transaction, and this was done upon the express offer of W. K. Reed, that the stock was to be held in place of the mortgage. Kelsey thus became a holder of the stock as a pledgee for a valuable consideration passed from him to W. K. Reed. Upon what principle, then, can it be held that this collateral, or its owner to the extent of its value, was in the position of a mere surety on the note of H. C. Reed then held by Kelsey?

If our view of the legal status of this stock in the hands of Levi Kelsey is correct, it follows that the renewal of the notes by Henry C. Reed did not discharge the collateral. Jones on Pledges, Sec. 541; Darst v. Bates, 51 Ill. 439; Worcester Nat. Bank v. Cheeney, 87 Ill. 602; Bond v. Liv. & Lon. Globe Ins. Co., 106 Ill. 654.

Where collateral has been pledged, not for the payment of any particular note but for the debt of another, the rule as to the release of a surety does not apply. Collins v. Dawley, 4 Col. 138.

A waiver of any legal or equitable right, at the request of another, is a sufficient consideration to support the promise. Severenz v. Haines, 36 Ill. 357 ; Miller v. Hawker, 66 Ill. 185 ; Buchanan v. International Bank, 78 Ill. 500.

In all cases a pledge is understood to be a security for the whole and for every part of the debt or engagement, unless it is otherwise stipulated between the parties. Baldwin v. Bradley, 69 Ill. 32 ; Story on Bailments, Sec. 301.

LACEY, J. It can not be doubted if a principal debtor place collateral securities in the hands of his creditor holding his promissory notes that no renewal of the notes or change of the contract between the parties without mentioning the collaterals would have the effect to release such collaterals, but we understand the law to be as well settled, that in case the principal debtor places collaterals in the hands of his debtors holding his note belonging to a third party who has simply loaned him the property to be pledged as collateral, and the creditor has notice of such fact, that such third party as to such security occupies the position of surety, and any change of the contract for a valuable consideration between the principal debtor and his creditor without the consent of such surety thereby releases the property so pledged from all lien of the creditor. Burnap v. National Bank of Potsdam, 96 N. Y. 125; Bank of Albion v. Burns, 46 N. Y. 170; Smith v. Townsend, 25 N. Y. 479; Fitch v. Cotheal, 2 Sandford's Ch. 32; Brown v. Sharp Rifle Co., 33 Conn. 18; Colebrook on Collateral Securities, Sec. 239.

There might be a case where the owner of property placed it in pledge for the debt of another, with the agreement and understanding that it was to stand good for the debt without reference to what the principals might do by way of changing the agreement, where the property would not be released by reason of any extension or change in the contract between the parties to the original contract. Such seems to be the interpretation put upon the facts of Collins v. Dawley, 4 Col. 138. We may say here, we do not approve the decision in that case and think it stands alone without support from

Reed v. Cramb.

any other court. It so seems to us in view of the law, that contracts of security are to be construed against the beneficiary, and where collaterals of a third party are in the hands of a pledgee as a security for the principal of a promissory note to the payee with the knowledge of the fact, the proper construction of the contract would be that such pledge only stands good for the fulfilment of the contract as it then stands. No other presumption should arise. But it is insisted that the long delay of appellant in not attempting to reclaim these securities from 1876 to 1879, when Levi Kelsey died, and still longer when H. C. Reed went insane, ought to be sufficient proof that he had agreed that the stock should stand good for the payment of the debt, regardless of changes in the contract without his consent. We think such fact alone should not have such effect. Appellant is not permitted to testify as to what he knows or what he did during that time, nor is there any proof that he was aware of the extensions. H. C. Reed was insolvent, or at least unable to pay his debts, and William K. Reed may have been, and no doubt was, aware of this fact and was not aware of the release, and allowed the matter to run along. His stock would not be released unless the time was extended. If he delayed purposely, his rights to reclaim the stock ought not to be defeated for that reason alone.

But it is claimed by appellee that, so far as Levi Kelsey knew at the time, W. K. Reed deposited the savings bank stock with him in lieu of the Buehler mortgage. H. C. Reed was the owner of the mortgage, and hence the stock must be regarded as being substituted for the mortgage in exactly the same way as he held the mortgage, notwithstanding he knew at the time the stock was placed in his hands by William K. Reed, that William K. was the owner thereof and that as between William K. and H. C. the former was surety for the latter. It is insisted also that William K. received consideration for making the substitute and pledging his stock; therefore he must be regarded as principal as regards his stock and may be treated as such by renewals without his consent without having the effect to release him as to the stock. The

appellee's case hinges upon the correctness of these assumptions.

It appears, as we gather from the evidence, that the Buehler note was the property of William K. Reed, and that in reality he was security to amount of the one thousand dollar mortgage in the first instance, H. C. Reed having borrowed the note of him, though the evidence fails to show that Levi Kelsey had notice of this fact, and had he renewed the note without such knowledge the security would not have been released, but in case he had been notified before extension that William K. was the owner and the note was simply loaned to H. C. Reed and the extension had been made, then he would have as effectually lost his lien on the note as he would if he had known the fact in the first instance, so that the fact of want of knowledge that William K. was the security to the amount of the note could only protect him in making renewals in the absence of such notice, no matter when acquired, before or after the making of the contract, so it was not after the extension.

Addison in his work on contracts lays this down as a rule, that notice coming to the party who takes the security after the contract, compels him to act with reference to the rights of the security in as equitable manner as though he had known it before. The text is as follows: "The doctrine of the discharge of the surety by time given to the principal debtor, by a binding contract, is not confined to cases where the relation of suretyship appears on the face of the original contract between the creditor, the principal and the alleged surety. The equity arises from the relation of the co-obligors, or promisors *inter se*, and on the knowledge by the creditors of the existence of that relation. It is held to be inequitable in the creditor knowingly to prejudice the rights of the surety, although he may know of the existence of the relation of suretyship only at the time of dealing with the principal debtor, so as to prejudice such rights. But extraneous evidence is not admissible for the purpose of showing that a party who, on the face of the contract, has incurred a primary liability, was only intended to be secondarily liable as

Reed v. Cramb.

surety after the default of another principal contracting party." Addison on Contracts, 864; Bailey v. Edwards, 4 B. S. 761; 34 L. J. Q. B. 41; Rayner v. Fussey, 28 L. J. Ex. 132; Pooley v. Harridone, 7 Ell. & B. 431; Greenough v. McClelland, 2 El. & El. 424; Davies v. Stainbank, 6 De Gex, M. & G. 696. Apply this doctrine to this case. At the time the substitution was made Levi Kelsey knew that the stock that was being substituted was the property of William K. Reed, and that as between him and H. C. Reed the former was security. He had no reason to suppose that this stock had been exchanged by way of sale for the note. There was no reason for such supposition. The stock was worth $5,000 and the mortgage $1,000. Then in such case equity would require him to regard the rights of the security and not extend the time of payment without his consent. Such even would have been the case as regards the mortgage upon notice of the suretyship, and much more with regard to the stock.

There could be no difference as far as Levi Kelsey's remedy for the collection of his debt is concerned, and his right to appropriate this stock to the payment of the notes of H. C. Reed, whether the collateral was put in pledge by the principal or William K. Reed. The only difference would be that he would not have to act in such manner in changing the contract or the time of the payment of the notes as not to injure the surety or obtain the latter's assent to the change. It is claimed by the appellee that as William K. Reed took up the note from Levi Kelsey, that the latter parted with something valuable, so constituting a valuable consideration moving to William K. Reed, and hence the stock, substituted for the mortgage and note, should be regarded as having been placed there by the principal and might be treated as belonging to a principal. But it may properly be answered that without some valid consideration the holder of the principal notes of H. C. Reed could have no claim on the stock whatever. The notes having been made and delivered by H. C. Reed to Levi Kelsey before the stock was placed in the latter's hands, without some such consideration there could be no claim on Kelsey's part to hold the stock in any legal right whatever. "There

must be a consideration for suretyship, otherwise it will be invalid. An agreement to be security for goods already sold to the principal is void." Addison on Contracts, 853. It would not seem to follow that the mere fact that there was a consideration for the suretyship at the time the Dime Savings Bank stock was delivered to Kelsey, that William K. Reed, to the extent of the stock, assumed the position of a principal. By way of illustration we may look at the matter in another light. Suppose the payee of a note, having no principal makers, agrees with one of the principals that if he will procure a surety to sign a new note with him, in consideration that the payee release and discharge the other principal, and the principal so contracting and the surety execute a note for the same amount and due the same time as the old note, and the other principal is released, would not the surety on the new note have all the rights of any other surety? While the release of the principal would be a good consideration to support the promise of the surety, he would none the less be a surety. In principle this is exactly the case at bar, even considering that the Buchler note was not shown to have been the note of William K. Reed, and even if the note were regarded as the property of H. C. Reed.

Another principle of law in regard to the contract of a surety is that it must be strictly construed in favor of the surety and his liability can not be extended by implication. Reynolds v. Hall, 1 Scam. 35; The People v. Moon, 3 Scam. 123. It must be strictly construed and his liability is never extended beyond the terms of his agreement, or at least its manifest import. In case of doubt the doubt is generally if not universally solved in his favor. Stull et al. v. Hance, 62 Ill. 52.

" The courts therefore in all cases construe doubtful contracts of suretyship, etc., in favor of the surety, so as to narrow rather than enlarge his liability." Addison on Contracts, 856. If then there could be by implication a construction not contained in the words of the letter placing the Dime Savings Bank stock in the hands of Kelsey "in place of " the note and mortgage, unfavorable to the surety, it should not be given, but

the construction should be favorable to him, if indeed *any* construction could, under the law we have cited, be unfavorable.

Because the court below committed error in granting the relief prayed for in the bill and decreeing the foreclosure and sale of the stock in the Dime Savings Bank, described in the bill, to satisfy the notes of H. C. Reed, described in the bill, the decree of the court below is reversed and the cause remanded to the court below with directions to that court to dismiss the bill.

*Decree reversed and cause remanded with directions.*